Thomas F. CLIFFORD and Thomas Clifford, Inc., Plaintiffs,

v.

James R. HUGHSON, Jamie Lynn Enterprises, Inc., Arthur E. Kessler, First National Bank of Jeffersonville and Jeffersonville Bancorp., Defendants.

No. 94 Civ. 9066(WCC).

United States District Court, S.D. New York.

Feb. 4, 1998.

---

Law Offices of Michael H. Sussman, Goshen, NY (Ambrose Wotorson, Michael H. Sussman, of Counsel), for Plaintiffs.

Dershowitz & Eiger, P.C., New York, NY (Nathan Z. Dershowitz, Amy Adelson, of Counsel), for Defendants James R. Hughson and Jamie Lynn Enterprises, Inc.

Mead Hecht Conklin & Gallagher, White Plains, NY (Kevin T. Conklin, of Counsel), for Defendants Arthur E. Kessler, First National Bank of Jeffersonville and Jeffersonville Bancorp.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Thomas Clifford ("Clifford") and Thomas Clifford, Inc. brought this action against defendants James R. Hughson ("Hughson"), Jamie Lynn Enterprises, Inc. ("JLE"), Arthur E. Keesler ("Keesler"), and First National Bank of Jeffersonville and Jeffersonville Bancorp (together, the "banks") for mail fraud, wire fraud, and conspiracy to defraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), and for common law fraud. Defendants now bring identical motions to dismiss the Third Amended Complaint and for sanctions pursuant to Rules 9(b), 11 and 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, defendants' motions to dismiss are granted and their motions for sanctions are denied.

## BACKGROUND

This case arises out of a series of lending and leasing transactions, through which plaintiffs claim that defendants used plaintiffs and other investors as "credit dummies" to establish and run a restaurant and to prevent foreclosure of that business. Plaintiffs assert that defendants defrauded them and other investors by "lur[ing]" them into taking out loans from the banks, and using the proceeds to establish a restaurant on premises leased from Hughson, from which Hughson planned to "evict plaintiffs, to expropriate plaintiffs' equipment and to take over plaintiffs' restaurant business."

Plaintiffs allege the following facts: In or around March 1990, defendant Hughson, through JLE, agreed to rent property to plaintiffs in Sullivan County, New York, and to assist plaintiffs in constructing and operating a restaurant. Plaintiffs agreed to pay JLE rent, in addition to a percentage of the restaurant's profits. Before signing the lease, Hughson told Clifford that he had borrowed $140,000 from the banks in order to purchase property and to construct and operate the restaurant, and that Keesler, the banks' president and Chief Executive Officer ("CEO"), would make an additional loan to Hughson at a later date. Hughson then asked plaintiffs to make a "good faith capital contribution" to the restaurant and promised to guarantee any debts that plaintiffs might incur. Hughson and Clifford both used Frederick Schadt, an attorney, who was also counsel to the banks, to negotiate and draft the lease. Though Hughson and Schadt had previously worked together, neither Hughson nor Schadt disclosed their relationship to plaintiffs.

In the spring of 1990, Clifford borrowed $30,000 from the banks, upon Keesler's assurance that Hughson and JLE would guarantee the loan. The note required only interest payments over a one-year period and then a balloon payment of the principal at the end of the year. The note was sent to Clifford by U.S. mail. That summer, Hughson borrowed $180,000 from the banks and consolidated the remainder of his debt. On October 1, 1990, plaintiffs opened TJ's, a restaurant and catering business in Hughson's building. Plaintiffs used the remainder of the loan as partial payment on fixtures, equipment and furnishings for the restaurant. On or about May 28, 1991, the banks rewrote plaintiffs' first note and lent plaintiffs an additional $30,000. The second note was guaranteed by Hughson and JLE but, unbeknownst to plaintiffs, it was secured by the restaurant equipment. The note was sent to plaintiffs by U.S. mail in June 1991. Plaintiffs used this second loan in purchasing additional equipment and to operate the business.

In or around the fall of 1992, plaintiffs claim that Hughson "demanded" a new lease, while "threatening to evict" plaintiffs. Under the new lease, plaintiffs would pay $1,000 per month from December through March, and $4,000 per month from April through November, 1992, plus 5% of TJ's gross revenues. The lease also provided that in the event of an eviction or breach, Hughson would obtain title to various pieces of restaurant equipment. Plaintiffs further allege that in or around December 1992, Hughson fraudulently induced them to borrow an additional $30,000 from the banks. Hughson once again told plaintiffs that the banks would approve the loans and that "the [loan] application would be a formality." However, plaintiffs claim that the banks "induced" them to pledge restaurant fixtures and equipment as collateral, "fully knowing that plaintiffs would eventually be evicted." The third note was sent to plaintiffs by U.S. mail. Plaintiffs used the third loan to purchase additional equipment and to operate the business.

In January or February 1993, Hughson served an eviction notice on plaintiffs by U.S. mail. Plaintiffs allege that the banks were informed of the eviction before it occurred and that defendants spread rumors that TJ's was going out of business. Specifically, plaintiffs allege that Hughson placed advertisements in local newspapers announcing the sale of a restaurant and catering business at TJ's location, which had a devastating effect on future catering reservations.

In January 1993, Clifford's wife, Catherine Clifford, promised the banks that she would pay the balance of the first note, then overdue, within one week. According to plaintiffs, an agent for the bank informed Mrs. Clifford that the banks would not collect on the note until then. Before the end of the week, however, Kaiser Hotel Restaurant and Equipment Corp. ("Kaiser") repossessed the restaurant's equipment and served plaintiffs with an eviction notice. Kaiser informed plaintiffs that it would cease repossession only upon the banks', Hughson's or JLE's direction. Mrs. Clifford then spoke to Keesler, who told her that he would accept payment only upon Hughson's consent. The

banks then brought suit against plaintiffs in state court to recover the debt. According to plaintiffs, the banks never foreclosed on the collateral equipment securing the note, and Hughson continued to operate TJ's with that equipment. Finally, in an effort to show a RICO "pattern," plaintiffs allege that defendants defrauded Dr. Jerome Triola in 1994, and Allan Breindel and Danielle Gespart in 1996, by using the same scheme.

## DISCUSSION

### I. *Relevant Legal Standards*

#### A. *RICO*

■ To state a claim for damages under 18 U.S.C. § 1962(c), a complaint must specifically allege:

(1) the existence of an enterprise which affects interstate or foreign commerce;

(2) that the defendants were "employed by" or "associated with" the enterprise;

(3) that the defendants participated in the conduct of the enterprise's affairs; and

(4) that the participation was through a pattern of racketeering activity.

*See Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir.1990). Furthermore, a plaintiff must explain how he was " 'injured in his business or property *by reason of* a violation of section 1962.' " *Id.* (quoting 18 U.S.C. § 1964(c)) (alteration in original).

#### B. *Rule 12(b)(6)*

On a motion to dismiss under Rule 12(b)(6), a court must "merely assess the legal feasibility of the complaint, [and] not ... assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980); *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 124 (2d Cir.1991). The Court should dismiss a RICO claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59

(1984)). Accordingly, we view the amended complaint in the light most favorable to plaintiffs, accept as true all allegations therein, and draw all reasonable inferences in plaintiffs' favor. *Annis v. County of Westchester*, 36 F.3d 251, 253 (2d Cir.1994); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).

### C. *Rule 9(b)*

 "In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of the rule is to (1) provide a defendant with fair notice of the fraud claim so he can prepare his defense; (2) protect a defendant from needless harm to his reputation; and (3) deter strike suits. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). "To satisfy Rule 9(b)'s particularity requirement, the complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas*, 886 F.2d at 11. Where multiple defendants are involved, the complaint must inform each defendant of the nature of his alleged participation in the fraud. *DiVittorio*, 822 F.2d at 1247. It is beyond dispute that Rule 9(b)'s pleading requirements apply to RICO predicate acts sounding in fraud. *E.g., Sterling Interiors Group, Inc. v. Haworth, Inc.*, No. 94 Civ. 9216, 1996 WL 426379, at *6 (S.D.N.Y. July 30, 1996). *See also Celpaco, Inc. v. MD Papierfabriken*, 686 F.Supp. 983, 988 (D.Conn.1988) ("stringent adherence to the particularity requirement is important ... where the predicate fraud allegations provide the only link to federal jurisdiction, and the opportunity for an award of treble damages—each of which might serve as significant in terrorem settlement leverage") (citing *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir.1979)); *Newman v. Rothschild*, 651 F.Supp. 160, 162 (S.D.N.Y.1986) (same).

### II. *Plaintiffs' Section 1962(c) Claim*

Section 1962(c) prohibits, *inter alia*, "any person ... associated with any enterprise engaged in, or [affecting] interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). The parties do not dispute that defendants Hughson and JLE are persons, as defined by the RICO statute, *see id.*, § 1961(3), that the banks constitute an "enterprise," *see id.*, § 1961(4), and that the banks affect interstate commerce, *see id.*, § 1962(c). The parties, however, disagree whether Hughson and JLE sufficiently conducted or participated in the banks' affairs through a pattern of racketeering activity.

### A. *Conduct or Participation*

In *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the United States Supreme Court held that section 1962(c) applies only to those who "participate in the operation or management of the enterprise itself." *Reves* determined that in order for a prospective defendant to be liable under section 1962(c), he must have had some part in directing, conducting or controlling the alleged RICO enterprise. *Id.* 507 U.S. at 179. The Court also suggested that section 1962(c) would not reach complete outsiders who by their very position were unable to operate or manage the enterprise itself. *See id.* at 185–86. *See also United States v. Viola*, 35 F.3d 37, 41 (2d Cir.1994) ("the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, [does not] bring a defendant within the scope of § .1962"). Accordingly, cases in this Circuit have dismissed RICO claims against defendants where the complaint did not raise an inference that the defendant "directed" the enterprise. *E.g., Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191, 1997 WL 603496, at *5 (S.D.N.Y. Sept.30, 1997) ("a defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1996 WL 383135, at *6–7 (S.D.N.Y. July 9, 1996) (dismissing claims against officers of independent construction company where complaint failed to

state how officers directed affairs of large brokerage firm).

■ In this case, plaintiffs allege an enterprise consisting of two banks.3d A. Cplt. at ¶¶ 9, 13, 67, 76. Nowhere do they allege that Hughson or JLE, independent commercial landlords, directed or controlled the banks' activities, or that Hughson, JLE and the banks constituted an enterprise. Plaintiffs merely claim that Hughson and JLE were "associated" with the banks and "participat[ed] indirectly in the banks affairs," by "causing documents, in furtherance of a scheme to defraud plaintiffs and use them as sources of credit, to be placed in the U.S. Mails." 3d A. Cplt. at ¶ 67. Under *Reves* and its progeny, such an allegation is insufficient to maintain a claim under section 1962(c). *See, e.g., Feirstein v. Nanbar Realty Corp.,* 963 F.Supp. 254, 258 (S.D.N.Y.1997) (accountants not liable under section 1962(c) for preparing allegedly fraudulent statements and mailing them to plaintiffs where plaintiffs did not allege control of enterprise).[1] Plaintiffs do not explain how Hughson and JLE participated in the banks' business of making loans, other than by guaranteeing two of them. While plaintiffs allege that Keesler would not accept payment on the first note without Hughson's consent, such statement by itself does not show that Hughson controlled the banks. *See, e.g., Morin v. Trupin,* 835 F.Supp. 126, 135 (S.D.N.Y.1993) (defendant does not participate in management or operation of enterprise simply because he has "substantial power to induce the . . . enterprise to take certain actions"). Indeed, the remainder of the complaint seems to suggest that Hughson and JLE were controlled by the banks. After all, it is uncontroverted that Hughson needed large sums of money in order to construct the restaurant

and that with such loans, he was over $300,-000 in debt to the banks. *Cf. Merrill Lynch,* 1996 WL 383135, at *6 (statement that outside defendants bribed officers at Merrill Lynch suggested that "control lay outside the hands of [outside defendants], who sought to influence those who were in control").

### B. *Pattern of Racketeering Activity*

■ Even if Hughson and JLE could be said to have "conducted or participated in" the bank's affairs, this Court concludes that plaintiffs have failed to state a pattern of racketeering activity and for this reason alone, plaintiff's RICO claims must be dismissed.

In order to allege a pattern of racketeering activity, a plaintiff must allege at least two predicate acts within a ten-year period. 18 U.S.C.1961(6). A primary consideration therefore is whether a complaint states two predicate acts. Plaintiffs' Third Amended Complaint does not.

■ Here, plaintiffs allege that defendants Hughson and JLE committed approximately eight acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, between February 1990 and October 1992. In order to have successfully pled a claim for mail or wire fraud under 18 U.S.C. § 1341 or 1343,[2] plaintiffs must have alleged: (1) the existence of a scheme to defraud; (2) the use of the United States mails or interstate wires to further that scheme; and (3) with the specific intent to defraud. *See, e.g., United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991).

The Third Amended Complaint does allege an "open-ended" scheme by which the banks, Hughson and JLE used plaintiffs and other

---

**1.** We decline to find that *Napoli v. U.S.,* 45 F.3d 680 (2d Cir.1995), requires a different result. In *Napoli,* the Court of Appeals affirmed the convictions of law firm investigators, who were "lower-rung participants," in the firm's scheme to litigate and settle fraudulent suits. *See* 45 F.3d at 683. The defendants were found to have "exercised broad discretion" in carrying out the lawyers' instructions. *Id. Napoli,* however, merely held that an erroneous instruction on management and control was not "a fundamental defect that inherently [gave] rise to a complete miscar-

riage of justice," where the evidence of defendants' guilt had been "overwhelming." *Id.* at 684. *Napoli* is therefore distinguishable on the facts and procedural posture of this case.

**2.** The law governing violations of the mail fraud statute is equally applicable to the wire fraud statute. *See Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Ventura,* 724 F.2d 305, 310 (2d Cir.1983).

investors as "credit dummies" to establish and run a restaurant and to prevent foreclosure of the business. The Third Amended Complaint also alleges that Hughson and Keesler used the United States mail and "telephonic and wire devices" to further this scheme. Plaintiffs assert that defendants defrauded them and other investors by "lur[ing]" them into taking out loans from the banks, which were purportedly guaranteed by Hughson, while Hughson intended to "evict plaintiffs, to expropriate plaintiffs' equipment and to take over plaintiffs' restaurant business."

■ In order to state a claim for wire fraud, a plaintiff must allege the use of interstate wires. *See Sterling*, 1996 WL 426379, at *9. The use of such wires is imperative to a wire fraud claim because, without it, the claim is jurisdictionally deficient. Here, plaintiffs merely allege that on numerous occasions, defendant Hughson used "telephonic and wire devices" to defraud them. *See, e.g.*, 3d A. Cplt. at ¶¶ 24, 25, 29, 37. Nowhere do they state that Hughson used interstate wires to place these calls. While the failure to plead use of interstate wires may be an oversight on plaintiffs' part, it appears more likely that plaintiffs cannot in good faith allege use of interstate wires. *Sterling*, 1996 WL 426379, at *9. Plaintiffs and defendants are all New York residents or corporations and the Third Amended Complaint suggests that each of the alleged acts occurred in New York. Thus, it is unlikely that any of the calls were placed out-of-state. Because plaintiffs do not, and apparently cannot, allege the use of interstate wires, their claims for wire fraud must be dismissed.

Plaintiffs do, however, allege that defendants used the U.S. mail to further the alleged scheme, on at least four occasions. These mailings are described as follows:

(1) "Keesler [wrote] letters—sent through the U.S. Mail—to the State Liquor Authority informing them of th[e $140,-000] loan and informing them that another loan of $180,000 would be made at a later date;"

(2) "Plaintiffs' ... [note] was sent via U.S. Mail in March 1990 .... in furtherance of a scheme to expropriate plaintiffs' restaurant business, and to use [Clifford] and others, as a means of obtaining additional credit;"

(3) "The final executed note was sent to plaintiffs via the U.S. Mail in June of 1991 .... [U]nbeknownst to plaintiffs, it was secured by restaurant equipment which plaintiffs had previously purchased and installed on the property ... Hughson owned .... These actions were done in furtherance of a scheme to expropriate plaintiffs' business and to use them and others, as mere 'credit dummies';" and

(4) "In January or February of 1992, defendant Hughson served plaintiffs through the U.S. Mail, with an eviction notice .... All defendants, associated in fact, were apprised [sic] of th[is] eviction[] before [it] occurred. All of these actions were in furtherance of an open-ended scheme to expropriate plaintiffs' business and to use them and others, as mere 'credit dummies'."

3d A. Cplt. at ¶¶ 21, 30, 35, 36.

■ Each of these four statements alleges use of the U.S. mail, and the approximate dates of the mailings. While the allegations do not state the exact date on which the mailings were sent, three of them provide the defendants with a one- to two-month time frame. This is sufficient. *See, e.g., Sterling*, 1996 WL 426379, at *7 ("fact that the complaint does not identify the ... exact date ... is not fatal"); *Tribune Co. v. Purcigliotti*, 869 F.Supp. 1076, 1088 (S.D.N.Y.1994) ("Rule 9(b) must be read in conjunction with Rule 8(a), which requires a plaintiff to plead only a short, plain statement upon which he is entitled to relief."), *aff'd on other grounds*, 66 F.3d 12 (2d Cir.1995).

■ Furthermore, it is also clear from the complaint how each mailing furthered the alleged scheme to defraud and each defendant allegedly participated in the scheme. Contrary to defendants' assertions, Rule 9(b) does not require each allegation "to specify the time and place [and sender] of each mail ... communication as long as the mechanics of the underlying scheme are pled with par-

ticularity[, and] .... the nature of each mail ... communication" and "the role of [each] communication[] in furthering [the] scheme" are identified. *Sterling*, 1996 WL 426379, at *7 *See also Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213, 229 (S.D.N.Y.1992) (where "nature and mechanics of the underlying scheme is sufficiently detailed, it is enough to plead the general content of the [mailing] without stating the exact words involved"). Each of the allegations specifies the nature of the communication, its recipient and its role in the alleged scheme. For example, immediately after plaintiffs recite the last mailing allegedly sent in furtherance of the scheme, they allege that

> defendants conspired and acted in concert by inducting plaintiffs, on numerous occasions between February and March of 1990 and October of 1992 via ... documents sent to plaintiffs through the U.S. mail to ... take out loans ... to purchase and install restaurant equipment in TJ's, knowing full well that Hughson intended to eventually evict plaintiffs and to expropriate plaintiffs' business, thereby allowing him to pay off all investment debts to defendant banks.

3d A. Cplt. at ¶ 37. *See also Sterling*, 1996 WL 426379, at *9 (upholding mail fraud claim against defendant corporation, even though .complaint did not "identify the agent through whom [defendant corporation] supplied the information"); *Tribune Co.*, 869 F.Supp. at 1089–90 (upholding amended complaint which set forth ten different mailings allegedly caused by union, where none of union defendants was identified as sender or recipient). *Cf. Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F.Supp. 1224, 1231–32 (S.D.N.Y. 1996) (dismissing RICO claims where amended complaint made "sweeping and general allegations of mail and wire fraud"). Moreover, from the nature of the alleged scheme it may fairly be inferred that while Hughson did not himself mail the notes to plaintiffs, he

should have foreseen that in the course of implementing the loans which he helped to secure, the mails would be used. *See United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989).

Nevertheless, the Court finds that the Third Amended Complaint does not state the requisite predicate acts for a different reason. Plaintiffs have not sufficiently alleged how the scheme was fraudulent. As we have previously held, "where the fraudulent scheme is premised upon an inadequate pleading of common law fraud, the allegations of mail and wire fraud must fail." *Morin v. Trupin*, 711 F.Supp. 97, 105 (S.D.N.Y. 1989); *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 423 (S.D.N.Y.1992); *Capasso v. CIGNA Ins. Co.*, 765 F.Supp. 839, 843 (S.D.N.Y.1991); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1453 (S.D.N.Y.1986); *River Plate Reinsurance Co. v. Jay–Mar Group, Ltd.*, 588 F.Supp. 23, 26–27 (S.D.N.Y.1984).[3]

To state a claim for common law fraud under New York law, a plaintiff must allege (1) a material, false representation by a defendant; (2) made with the intent to defraud; (3) reasonable reliance upon the representation by the plaintiff; (4) causing damage to the plaintiff. *Katara v. D.E. Jones Commodities Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987); *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (1969). *See also ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308, 1323 (S.D.N.Y.1997) (same). Here, plaintiffs allege that defendants Hughson and JLE defrauded them (1) by failing to disclose Hughson's prior relationship with their attorney, Schadt and (2) by misrepresenting to them that Hughson would make a good faith effort to assist in furthering the success of the restaurant. Neither of these alleged misrepresentations or omissions constitutes fraud. First, in order for an omission to

---

**3.** We note that the Court of Appeals has not yet determined whether a claim for mail fraud should be dismissed if it does not state a claim for common law fraud. This does not concern us here, because the Third Amended Complaint not only fails to state a claim for common law

fraud, it does not even explain how the alleged misstatements were fraudulent. The mail fraud statute makes clear that an allegation of fraud must be stated to support such a claim. *See* 28 U.S.C. § 1341 (requiring fraudulent scheme).

constitute fraud, a defendant must have a duty to disclose information to the plaintiff. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank N.A.,* 731 F.2d 112, 123 (2d Cir. 1984); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 283 (2d Cir.1975). A duty to disclose arises only when " 'the parties enjoy a fiduciary relationship,' " or " 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.' " *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 738–39 (quoting *Aaron Ferer & Sons Ltd.,* 731 F.2d at 123). Plaintiffs do not anywhere allege that defendants Hughson or JLE, as commercial landlords, had a fiduciary relationship to plaintiffs. The "landlord-tenant relationship is not ordinarily a fiduciary one." *In re Caulfield,* 192 B.R. 808, 818 (Bkrtcy. E.D.N.Y.1996) (citing cases). *Cf.* N.Y. Gen. Obl. Law § 7–103 (requiring that landlord not commingle security deposits with his own account). A landlord is not inherently the fiduciary of his tenant. *In re Carolina Steel Corp.,* 179 B.R. 413, 418 (Bkrtcy. S.D.N.Y.1995). Thus, if a plaintiff wishes to impose a fiduciary duty on a landlord, he must plead the existence of a special relationship creating such a duty.

Here, it is true that the relationship between Hughson and plaintiffs was not one typical of a landlord and tenant. *See, e.g., Schwanke v. Berghauer,* 83 A.D.2d 627, 627–28, 441 N.Y.S.2d 1001, 1001 (2d Dept.1981) (Mem.) (Hopkins, J. dissenting) (opining that fiduciary duty had been breached where landlord had given tenants option to purchase premises and landlord actively competed with tenants and destroyed their business). It could even be said that the Third Amended Complaint suggests that plaintiffs were partners in the restaurant business with Hughson and JLE, at least with respect to plaintiffs' "good faith" capital contribution and furnishing of fixtures and equipment. However, plaintiffs have not characterized the nature of their relationship with Hughson and JLE, or alleged any facts from which a fiduciary duty could be inferred, and the Court cannot presume that such a duty existed. *See, e.g., Spira v. Nick,* 876 F.Supp. 553, 557 (S.D.N.Y.1995) (implying that complaint must state allegations of fiduciary duty "with a fair degree of specificity"); *Celpaco, Inc.,* 686 F.Supp. at 989 (suggesting that breach of fiduciary duty must be alleged, along with explanation of breach). *Cf. Manson v. Stacescu,* 11 F.3d 1127, 1131 (2d Cir.1993) (noting but not deciding whether plaintiff-appellants' failure to allege breach of fiduciary duty was grounds for dismissal); *Shopping Mall Investors, N.V. v. E.G. Frances & Co.,* 1985 WL 210 (S.D.N.Y. Jan.23, 1985) (finding duty where plaintiff had alleged sufficient facts to suggest that it had acted as defendant's agent in real estate transaction).

Moreover, plaintiffs do not allege that they would not have borrowed the money or entered into the lease if they had known of Hughson's relationship with Schadt. Nor do they allege how the undisclosed relationship contributed to the failure of their restaurant business or otherwise adversely affected them in any way.

 Furthermore, the Third Amended Complaint does not allege that Hughson told plaintiffs that he would make a good faith effort to assist them, much less where, when and how such a promise was made. Although all contracts include an implied covenant of good faith, *see Murphy v. American Home Products,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86 (1983); *Wood v. Duff–Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (1917), a breach of contract, even if committed in bad faith, does not necessarily involve an intent to defraud. *See Rocanova v. Equitable Life Assur. Soc. of U.S.,* 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940 (1994). "[A] contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." *Id.* In order to state a claim for mail fraud, a complaint "must allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." *Cosmas,* 886 F.2d at 12–13; *Wexner v. First Manhattan Co.,* 902 F.2d 169, 173 (2d Cir. 1990). While the Third Amended Complaint does suggest that defendants had a motive to defraud plaintiffs, it does not allege any facts from which it might be inferred that they actually did so. Indeed, there is not even an

allegation that the banks were even aware of Hughson's failure to disclose Hughson's relationship with Schadt or of any promise by Hughson to assist with the restaurant business. *See Cosmas,* 886 F.2d at 13. Though Rule 9(b) allows "intent, knowledge, and other condition of mind" to "be averred generally," other than conclusory allegations pertaining to defendants' motive, the Third Amended Complaint contains not even general allegations of knowledge, much less of intent to defraud.

Because the Court holds that plaintiffs have failed to plead even one predicate act, there is no need to consider whether the complaint has alleged a pattern of racketeering activity.

### III. *Plaintiffs' Section 1962(d) Claim*

■ Because plaintiffs do not state at least two predicate acts of racketeering, they cannot maintain a claim for conspiracy under section 1962(d). *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990). Accordingly, I dismiss plaintiffs' claim that Keesler and the banks conspired with Hughson and JLE to defraud them.

### IV. *Plaintiffs' State Claims*

Additionally, we decline to hear plaintiffs' state claims, because the Court has no basis for federal jurisdiction. *See* 28 U.S.C. § 1367; *Brotherhood of Locomotive Engineers v. Long Island Railroad Co.,* 85 F.3d 35, 39 (2d Cir.1996).

### V. *Sanctions*

■ Finally, defendants' Rule 11 motions for sanctions are denied. Here, we note that our power to impose sanctions under Rule 11 is now "discretionary rather than mandatory." *Knipe v. Skinner,* 19 F.3d 72, 78 (2d Cir.1994). Under the amended rule, sanctions may be imposed where court papers have been signed, filed, submitted, or later advocated, for an "improper purpose, such as to harass or cause unnecessary delay or needlessly increase ... the cost of litigation," or "the claims, defenses and other legal contentions therein are [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b). If a court determines that Rule 11(b) has been violated, it "*may* impose ... an appropriate sanction upon the attorneys, law firms, or parties that have violated [the subdivision] or are responsible for the violation." Fed.R.Civ.P. 11(c) (emphasis added).

■ The Court of Appeals has determined that Rule 11 sanctions "should be imposed with caution." *Knipe,* 19 F.3d at 78. "[A]ny and all doubts must be resolved in favor of the signer." *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985). *See also Rodick v. City of Schenectady,* 1 F.3d 1341, 1350 (2d Cir.1993) (" 'When divining the point at which an argument turns from merely losing to losing and sanctionable, ... we have instructed the district courts to resolve all doubts in favor of the signer.' ") (citations omitted).

■ On the record before the Court, we cannot conclude that sanctions are warranted. Of primary importance is the fact that plaintiffs amended their complaint each time with leave of the Court, in a good faith effort to supply the missing elements of a RICO claim. In these circumstances, it would be inappropriate to impose sanctions for plaintiffs' ultimate failure to do so. *Accord Scheiner v. Wallace,* 860 F.Supp. 991, 1002–03 (S.D.N.Y.1994) (where court had directed plaintiffs to plead predicate acts of mail fraud, it was inappropriate to impose sanctions for defective RICO claim). *See also Browning Ave. Realty Corp. v. Rosenshein,* 142 F.R.D. 85, 91 (S.D.N.Y.1992) (same, where prior opinion "explicitly invited [plaintiff's] attempt to re-plead its complaint").

We conclude that a reasonable attorney could believe that the RICO claim had a chance to succeed, particularly in light of the Court's encouragement. *See, e.g., Richter v. Achs,* 174 F.R.D. 316, 318–19 (S.D.N.Y.1997) (declining sanctions where plaintiff failed to state predicate acts with sufficient particularity). This is certainly not a case where the Court has admonished plaintiffs that Rule 11 sanctions could be imposed upon amendment. *Cf. McLoughlin v. Altman,* No. 92 Civ. 8106, 1995 WL 640770, at *2 (S.D.N.Y. Oct.31,

1995) (imposing Rule 11 sanctions where court had warned plaintiff of the possibility of such sanctions prior to amendment); *Keles v. Yale Univ.,* 889 F.Supp. 729, 736 (S.D.N.Y. 1995) (imposing Rule 11 sanction where attorney ignored repeated warnings from court that such sanctions might be warranted), *aff'd without opinion,* 101 F.3d 108, 1996 WL 115329 (2d Cir.1996).

Contrary to defendants' contention, there is nothing in the record to suggest that plaintiffs' filed the Third Amended Complaint for an improper purpose such as harassment. Accordingly, defendants' motions for Rule 11 sanctions are denied.

### VI. *The Third Amended Complaint is Dismissed with Prejudice*

The RICO claims are dismissed with prejudice, for three reasons. First, plaintiffs have already been given three opportunities to amend their complaint, and yet it still fails to state a claim under RICO. Second, it does not appear that plaintiffs will ever be able to state a viable RICO claim, because "[s]imply put, this is a landlord tenant dispute that has escalated due to the personal animosity" between Clifford and Hughson. *Rosendale v. Citibank, N .A.,* No. 94 Civ. 8591, 1996 WL 175089, at *5 (S.D.N.Y. April 15, 1996). *See also Scheiner,* 860 F.Supp. at 998 (dismissing RICO claims with prejudice where amended complaint failed to state predicate acts). Third, if plaintiffs have any viable claim against defendants, it can be effectively pursued in state court.

### CONCLUSION

Plaintiffs' RICO claims are dismissed with prejudice. The Court declines to assert supplemental jurisdiction over plaintiffs' state claims. Accordingly, these claims are dismissed without prejudice. Thus, the Third Amended Complaint is dismissed in its entirety. Defendants' motions for Rule 11 sanctions are denied.

SO ORDERED.