**In re EVERFRESH BEVERAGES, INC. and Sundance Beverages, Inc., Debtors.**

**Bryan D. Barr and Gary Walters, Trustees for Liquidating Trust for EBUS Liquidation Corp. and SBUS Liquidation Corp. (formerly known as Everfresh Beverages, Inc. and Sundance Beverages, Inc.), Plaintiffs,**

v.

**Charterhouse Group International, Inc., Tellin, Inc., Tellin Holdings LLC, Charterhouse Equity Partners, CHU-SA Equity Investors, L.P., and Charterhouse Equity Inc., Defendants.**

**Bankruptcy Nos. 95–B–45405(JHG), 95–B–45406(JHG), Adversary No. 97–9148A.**

United States Bankruptcy Court, S.D. New York.

Aug. 25, 1999.

Obermayer, Rebmann, Maxwell & Hippel, LLP, Haddonfield, NJ, By Gregory D. Saputelli, Lawrence J. Tabas, and Kimberly D. Sutton, for Plaintiffs.

Proskauer Rose LLP, New York City, By Claire P. Gutekunst, and Bruce E. Fader, for Defendants.

## DECISION ON MOTION TO AMEND COMPLAINT

· JEFFRY H. GALLET, Bankruptcy Judge.

### BACKGROUND

Bryan D. Barr and Gary Walters, Trustees of the Liquidating Trust for EBUS Liquidation Corp. and SBUS Liquidation Corp. (collectively, the "Plaintiffs") move pursuant to Rules 7015 and 7019 of the Federal Rules of Bankruptcy Procedure [1] to amend their complaint and

---

**1.** These two rules make Rules 15 and 19 of     the Federal Rules of Civil Procedure

join additional parties as defendants.[2] Charterhouse Group International, Inc. ("Charterhouse Group"), Tellin, Inc. ("Tellin"), Tellin Holdings LLC ("Tellin Holdings"), Charterhouse Equity Partners ("CEP"), CHUSA Equity Investors, L.P. ("CHUSA"), and Charterhouse Equity Inc. ("CEI") (collectively, the "Defendants") support the motion to the extent that the Plaintiffs, in the proposed amended complaint[3] (the "Proposed Amended Complaint"), withdraw certain claims asserted in the initial complaint ("Initial Complaint") but oppose the remainder of the motion on several grounds. Defendants primarily argue that amending the complaint would be futile because the Proposed Amended Complaint could not withstand a motion to dismiss. Thus, the Defendants' papers, although styled as "opposition," read, in part, as a cross-motion to dismiss the Plaintiffs' complaint and, in part, as opposition to the Plaintiffs' motion for leave to amend.

The Plaintiffs' motion for leave to amend their complaint is **GRANTED.**

## PROCEDURAL HISTORY

Everfresh Beverages, Inc. ("Everfresh") and Sundance Beverages, Inc. ("Sundance"), a whole owned subsidiary of Everfresh, (collectively, the "Debtors") filed petitions under chapter 11 of the United States Bankruptcy Code, (the "Code") on November 17, 1995. The Debtors remained in possession of their assets and business affairs as debtors-in-possession pursuant to § 1108 of the Code. On January 5, 1996, the Debtors completed sale of substantially all of their Canadian assets to Sweet Ripe Drinks, Ltd. and ceased their Canadian business operations.

On March 15, 1996, the Debtors completed a sale of substantially all of their assets in the United States to EB Acquisition Corp. and ceased their American business operations. After the sales, Everfresh and Sundance changed their names to EBUS Liquidation Corp. and SBUS Liquidation Corp., respectively.

On August 17, 1997, I entered an Order confirming the Debtors' consolidated plan of liquidation. The plan provided, *inter alia,* for the appointment of the Plaintiffs as trustees of the Liquidating Trust for EBUS Liquidation Corp. and SBUS Liquidation Corp.

Exactly two years to the day after the petitions were filed, on November 17, 1997, the Plaintiffs brought this proceeding. The Initial Complaint consists of ten causes of action against the Defendants pursuant to §§ 544(b) and 550 of the Code and, by incorporation, the New York fraudulent conveyance law, §§ 270 to 278 of the New York Debtor and Creditor Law.

Following the commencement of this adversary proceeding, the parties engaged in extensive document discovery. More than 20,000 documents were exchanged. No depositions, however, have been taken. The Plaintiffs contend that, upon reviewing these documents they deemed it necessary to amend their pleadings. They also claim that, in an effort to mitigate the prejudice that naturally arises when a party significantly modifies its pleadings during the course of a case, they strove to amend their pleadings before depositions were conducted.

("FRCP"), with minor changes, applicable to adversary proceedings before Bankruptcy Courts.

**2.** The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This

is a core matter under 28 U.S.C. § 157(b)(2)(A).

**3.** Actually, the Proposed Amended Complaint is a proposed second amended complaint because the Initial Complaint was amended shortly after being served to correct a minor error in the caption.

I am faced with essentially two motions. One by the Plaintiffs for leave to amend, which is opposed by the Defendants, and one by the Defendants to dismiss for failure to state a cause of action, which is opposed by the Plaintiffs. In addition, each of the prayers for relief have a different standard that the movant must meet. As a result, I divide my discussion into separate parts and address each motion in turn.

## FACTS

■ In examining the sufficiency of a pleading, I must accept as true all facts alleged. *See Suna v. Bailey Corp.*, 107 F.3d 64, 66 (1st Cir.1997); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1125 (2d Cir.1994).

Prior to the filing date, Everfresh manufactured and distributed juices, juice drinks, lemonade and related products throughout the United States and Canada under the brand name Everfresh and, in the United States only, under the brand name Wagner. Sundance manufactured sparkling juice products consisting of 70 percent juice and 30 percent sparkling water. The Debtors distributed their products via a network of more than 250 distributors who purchased the product from the Debtors and then distributed it to retail stores.

In the Initial Complaint the Plaintiffs make a series of background allegations regarding the Defendants and their relationships to the Debtors. They are "based upon information and belief" and can be summarized as follows:

(1) that the Defendants are related entities, have interlocking ownership and are insiders of the Debtors (Tellin owns

approximately 75% of Everfresh; Tellin Holdings owns 100% of Tellin; CEP owns 100% of Tellin Holdings and 4.5% of Everfresh; CHUSA is a general partner of CEP; and CEI is a general partner of CHUSA);[4]

(2) that "[p]rior to the Filing Date, the Debtors encouraged and induced vendors and creditors, *inter alia*, to continue to supply product and to provide services without advising vendors and creditors that the Debtors ... [either] were insolvent, had unreasonably small capital for their business, [or] believed that they would incur or intended to incur debts beyond their ability to pay as they matured;"[5]

(3) that "[w]hile the creditors remain unpaid ... [the Defendants] ... siphoned off the Debtors' assets to themselves and/or for the benefit of themselves. [A]ccording to the Debtors' audited financial statements for the years ending 1992, 1993 and 1994, more than 6.0 million dollars ($6,000,-000) was transferred to the [Defendants] and/or related parties during the period of 1992 through 1994;"[6] and

(4) that the transfers of assets occurred at times shortly before and after substantial debt was incurred by the Debtors.

In addition to the preliminary allegations, the Initial Complaint contains ten counts against the Defendants regarding five alleged fraudulent transfers to one or more of the Defendants. These transfers, as alleged in the Initial Complaint, can be briefly summarized:

*Counts I and III:* The Plaintiffs allege in these two counts that the Debtors transferred approximately $1.477 million

---

4. Charterhouse Group's relationship to the other Defendants is not explained in the Initial Complaint other than as an insider of the Debtors and as a related entity or affiliate of the other Defendants. In the Proposed Amended Complaint, however, the Plaintiffs allege that all of the other Defendants conduct their business out of the same office as Char-

terhouse Group and that "Charterhouse [Group] operates and promotes itself as, *inter alia*, a 'leveraged acquisitions company.'" Proposed Amended Complaint ¶ 7.

5. Initial Complaint ¶ 26.

6. *Id.* ¶ 34.

to defendant Charterhouse Group as an "Acquisition Fee Payment." The Plaintiffs further allege in Count I that this transfer was a fraudulent transfer-constructive fraud as that term is defined in the New York Debtor and Creditor Law §§ 273 to 275. In Count III, the Plaintiffs allege that the Acquisition Fee Payment was a fraudulent transfer-actual fraud as that term is defined in § 276 of the New York Debtor and Creditor Law.

*Counts II and III:* The allegations in these two counts are similar, except that there is more than one transfer to Charterhouse Group at issue and they are described as "Management Fee Payments." The Management Fee Payments alleged are $1 million in 1992, $1 million in 1993, and $46,000 in 1994. In Count II the Plaintiffs allege that these payments were fraudulent transfers-constructive fraud and in Count III they allege that they were fraudulent transfers-actual fraud.

*Counts IV and V:* Counts IV and V are similar to Counts II and III except that different Management Fee Payments are alleged. Here, the alleged beneficiary of the payments is Tellin. The total amount allegedly transferred is $804,000. The Plaintiffs allege in Count IV that these payments were fraudulent transfers-constructive fraud and in Count V they allege that they were fraudulent transfers-actual fraud.

*Counts VI and VII:* Counts VI and VII allege that approximately $2 million was transferred to one or more unnamed Defendants or persons related to these entities as "advances." In Count VI the Plaintiffs allege that the Advances were fraudulent transfers-constructive fraud and in Count VII they allege that they were fraudulent transfers-actual fraud.

*Counts VIII and IX:* Counts VIII and IX mirror Counts VI and VII, except that the payment is entitled "RD Expense Payment" and the amount is $480,000.

*Count X:* In Count X the Plaintiffs allege that the Defendants are alter egos of the Debtors and, as such, are liable for all of the debts of the Debtors.

Seven months after the Initial Complaint was filed, and following extensive documentary discovery by both parties, the Plaintiffs moved to amend their complaint. In the Proposed Amended Complaint the Plaintiffs allege slightly different background facts from those in the Initial Complaint, none of which are significant to this motion. The Proposed Amended Complaint also increases the amount sought from approximately $6.7 million to approximately $57 million. In addition, the Proposed Amended Complaint provides more detail than the Initial Complaint and no longer pleads on "information and belief."

The Plaintiffs seek to add four new parties (the "Proposed Additional Defendants"). They have yet to be brought within the Jurisdiction of this Court and are not part of this motion. These parties and their relationships to the Debtors and the Defendants are described by the Plaintiffs in the Proposed Amended Complaint.

James F. Pomroy ("Pomroy") was affiliated with Charterhouse Group as a "Charterhouse entrepreneur," was a "Management Investor" in Tellin Holdings. Pomroy is an insider of the Debtors. Pomroy had an ownership interest in Tellin Holdings that ranged from 12% on January 31, 1992 to 3.9% on or about April 8, 1994. Pomroy was also President of Tellin and, at various times, was a Director and Chairman of both Everfresh and Sundance.

Lawrence C. Conway ("Conway") was the CEO of Tellin and Director, President and CEO of both Debtors until his removal from these positions by Charterhouse Group in early 1994. Conway was a Management Investor in Tellin Holdings and had a 5% ownership interest. Conway is an insider of the Debtors.

Stephen I. Siller ("Siller") is a partner in the law firm of Siller, Wilk & Mencher, now known as Siller Wilk LLP. Siller, Wilk & Mencher is also a defendant. Sil-

ler was a Management Investor in Tellin Holdings and had an ownership interest that ranged from 0.5% on January 31, 1992 to .2% on April 8, 1994. Siller also served as a director and officer of Tellin, CEP and the Debtors. Siller is an insider of the Debtors.

In addition to adding new parties, the Plaintiffs, in the Proposed Amended Complaint, seek to add and drop several claims alleged in the Initial Complaint. The claims which are sought to be dropped are those regarding Management Fee Payments to Tellin, Advances to one or more of the Defendants, and RD Expense Payments to one or more of the Defendants. Thus, two of the five initial claims, and the alter ego claim, remain in the Proposed Amended Complaint (the "Remaining Claims"), the Acquisition Fee Payment to Charterhouse Group and the Management Fee Payment to Charterhouse Group. One of these is sought to be separated into two claims and the other reduced.

In the Initial Complaint, the Acquisition Fee Payment made to Charterhouse Group is alleged to be $1.477 million, while in the Proposed Amended Complaint the transaction is described as a $1.2 million Acquisition Fee Payment and a $276,662 "Pre–Acquisition Expense Payment." The Proposed Amended Complaint also adds more detail regarding this claim, specifying the date that these payments were made, February 7, 1992. The Plaintiffs also seek to reduce the total amount sought for Management Fee Payments to Charterhouse Group and, as with the Acquisition Payment claims, the dates the monies were transferred are now specified.

The centerpiece of the Proposed Amended Complaint are several claims not raised in the Initial Complaint (the "New Claims"). These claims, which are asserted against the Defendants and the Proposed Additional Defendants, are best presented in narrative format.

In December 1991, Tellin entered into a purchase agreement to purchase the U.S. and Canadian assets of Everfresh from John Labatt Limited and entities related to it ("Labatt"). The agreement specified that performance under the agreement was guaranteed by Charterhouse Group and/or CEP. In a separate transaction, Tellin agreed to purchase the assets of New Era Beverages, Inc. (Sundance) from Guinness PLC, Stroh Brewery Co., and entities related to these companies ("Stroh"). Both transactions closed on or about January 31, 1992.

Part of the financing for these sales was provided by a revolving and term loan facility provided by CIT Business Credit, Inc. ("CIT"). The deal was structured as a leveraged buyout in that the assets of the entities to be purchased, Everfresh and Sundance, were used to secure CIT's loan. Thirty-eight million dollars was borrowed from CIT to complete this transaction and it is alleged that this borrowing had the effect of reducing the Debtors' equity by $38 million to the detriment of the Debtors' creditors and imposing a burden on the Debtors, the obligation to repay the loan, which rightfully should have been the Defendants' burden.

Also, as part of the acquisition agreement, the purchase price was to be adjusted based upon actual working capital acquired. In October of 1993, the purchase price of the Everfresh sale was adjusted upward by approximately $5 million, thereby requiring an additional payment to Labatt of this amount. That payment, which was made by the Debtors, is one that should have been paid, according to the Plaintiffs, by the Defendants and had the effect of further reducing the debtor's equity. The total amount of equity reduction as a result of the purchase was $43 million.

In Count I of the Proposed Amended Complaint the Plaintiffs allege that the pledge of collateral as well as the payment to Labatt constituted fraudulent transfers- constructive fraud as that term is defined by §§ 273–275 of the New York Debtor and Creditor Law. The Plaintiffs also allege that the Defendants are alter egos of

each other with interlocking ownership and control and are therefore jointly and severally responsible to the Plaintiffs for the $43 million. (*See also*, Count XIII which specifically alleges that the Defendants are alter egos of each other.) In Count III, the Plaintiffs allege that the pledge and payment constitute fraudulent transfers-actual fraud as that term is defined by § 276 of the New York Debtor and Creditor Law.

Following the purchase, the Defendants caused the Debtors to make interest payments to CIT and/or Labatt in the total amount of approximately $9.9 million. In Count II, the Plaintiffs allege that because the Debtors did not obtain any value for the debt to CIT and Labatt, the interest payments were fraudulent transfers-constructive fraud. And, in Count III, the Plaintiffs allege that the interest payments constitute fraudulent transfers-actual fraud.

Counts IV, V, VI and IX of the Proposed Amended Complaint contain the allegations discussed above regarding the Remaining Claims: payments made to Charterhouse Group as Pre–Acquisition Fee payments, Acquisition Fee payments and Management Fee payments.

In addition to these payments, on various dates following the acquisition transactions, the Debtors transferred to Charterhouse Group $363,346 as "Post–Acquisition Expense Payments." These payments, as with the others, are alleged to be both fraudulent transfers-constructive fraud (Count VII) and fraudulent transfers-actual fraud (Count IX).

On January 31, 1992, the Debtors transferred to Siller and the law firm of Siller, Wilk and Mencher the sum of $1.25 million representing the cost of legal services allegedly incurred in connection with the acquisition transactions. The Plaintiffs allege that the Defendants instead of the Debtors should have paid these bills because the Debtors did not receive fair consideration for this expense and the obligation to pay these costs belonged solely to the Defendants and not to the Debtors. This payment is alleged to be a fraudulent transfer-constructive fraud (Count VIII) and a fraudulent transfer-actual fraud (Count X).[7]

## DISCUSSION

The Defendants oppose the Plaintiff's motion to amend and to add new defendants pursuant to Rule 15(a) on the grounds of futility, excessive prejudice, and undue delay.[8] Rule 15(a) states that after a responsive pleading is served "a party may amend [its] pleading only by leave of the court ... and leave shall be freely given when justice so requires." FRCP Rule 15(a). This rule allows litigants to amend their pleadings for a wide spectrum of purposes. *See G.G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.)*, 217 B.R. 433 (Bankr.S.D.N.Y. 1998). Furthermore, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep ... may be decisive to the outcome and accept the principle that the purpose of the pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Ramos v. O'Connell*, 169 F.R.D. 260, 262 (W.D.N.Y.1996) (stating that "the federal courts have demonstrated considera-

---

7. On July 16, 1998, the Plaintiffs amended their Proposed Amended Complaint to add another claim. The Court's file does not contain a copy of this document. Based upon my readings of the Defendants' papers, it appears that the Plaintiffs in proposed Count XIV allege that defendants Charterhouse Group, CEP, CHUSA and CEI breached fiduciary duties owed to defendants Tellin and Tellin Holdings and to the Debtors.

8. Although Defendants' papers leave the impression that they represent the Proposed Additional Defendants, they do not. This decision is limited in its application to the rights of the parties that have appeared in this case. The Proposed Additional Defendants' rights, including objecting to the Plaintiffs' complaint on the ground of timeliness, are not before me.

ble leniency in allowing plaintiffs to amend their complaints whenever justice so requires.").

■ Balanced against this liberal reading of the federal rules, is the need to preserve the integrity and efficiency of the courts. Leave to amend a complaint, therefore, "will be denied if it were sought in bad faith, it would cause undue delay or prejudice to the adversary, when it would be futile, or if there has been repeated failure to cure amendments by amendments previously allowed." *In re G. Survivor Corp.*, 217 B.R. at 436, (*citing Champlain Enters., Inc. v. United States*, 945 F.Supp. 468, 475 (N.D.N.Y.1996)). *Accord Dluhos v. Floating and Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998); *Hemphill v. Schott*, 141 F.3d 412, 420 (2d Cir.1998).

### a. Futility

■ Defendants futility argument is, essentially, a motion to dismiss pursuant to Rule 12(b)(6).[9] A motion for leave to amend should be denied if the new parties or claims could not survive a motion to dismiss. *See Grace v. Rosenstock*, 169 F.R.D. 473, 480 (E.D.N.Y.1996). *See also S.S. Silberblatt, Inc. v. East Harlem Pilot Block—Building 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979) (leave to add a new cause of action will not be granted unless the movant has "colorable grounds for relief" under the new claim); *Katzman v. Sessions*, 156 F.R.D. 35, 38 (E.D.N.Y.1994) ("a proposed pleading will be considered futile if it fails to state a claim that could withstand a motion to

dismiss") (citation omitted); *United States Metal & Coin Co. v. Burlock*, 652 F.Supp. 37, 39 (E.D.N.Y.1986) (a "trial court does not abuse its discretion in denying leave to amend a complaint which even as amended would fail to state a cause of action"). Accordingly, I treat this argument as such and apply the Rule 12(b)(6) standard. *See Occidental Chem. Corp. v. OHM Remediation Servs. Corp.*, 173 F.R.D. 74, 76 (W.D.N.Y.1997) ("[w]hen considering whether a proposed amendment [is] futile, courts generally apply an analysis comparable to that governing a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." (citations omitted)). *See also Vermont Assembly of Home Health Agencies, Inc. v. Shalala*, 18 F.Supp.2d 355, 361 (D.Vt.1998) (courts may, in their discretion, deny motions for leave to amend where the amended pleadings could not survive a motion to dismiss for failure to state a claim); *Mroz v. City of Tonawanda*, 999 F.Supp. 436, 466 (W.D.N.Y.1998) ("[w]hether a proposed amendment would be futile is analyzed according to whether the proposed amendment states a claim for which relief can be granted under Fed.R.Civ.P. 12(b)(6)."); *In re G. Survivor Corp.*, 217 B.R. at 438 (same).

■ The party who is making a motion to dismiss must meet a heavy burden because such motions run contrary to the strong institutional bias in American jurisprudence to have matters decided on their merits. *See Baker v. Cuomo*, 58 F.3d 814, 818 (2d Cir.1995). A court should grant a motion pursuant to Rule 12(b)(6), therefore, "only if it is clear that no relief could

---

9. The parties have submitted numerous affidavits in support of their respective motions and in opposition to the other party's motion. With respect to Defendants' contention that leave to amend should not be granted because it would be futile, as discussed below, I am treating this aspect of the Defendants' opposition as if it were a separate motion to dismiss. Since I am treating the futility arguments as a motion to dismiss, my analysis is limited to the sufficiency of the pleadings. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, 503 U.S. 960,

112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Milgrim Thomajan & Lee P.C. v. Nycal Corp.*, 775 F.Supp. 117, 121 (S.D.N.Y.1991) (citing *Kopec v. Coughlin*, 922 F.2d 152, 154–55 (2d Cir.1991)); *Eisenberg v. Feiner (In re Ahead by a Length)*, 100 B.R. 157, 164 n. 2 (Bankr. S.D.N.Y.1989). I chose not to convert this motion into a summary judgment motion pursuant to Rule 12(c) of the FRCP. I, therefore, have not considered the affidavits in deciding the futility aspect of the Defendants' opposition to the Plaintiffs' motion.

be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court must also read the complaint generously, *see Leslie Fay Cos. v. Corporate Property Assocs. 3, (In re Leslie Fay),* 166 B.R. 802, 807 (Bankr.S.D.N.Y.1994), and draw all reasonable inferences in favor of the pleading party. *See Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994), *cert. denied,* 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994).

▆▆▆▆ On the other hand, even liberal construction has its limits. "[F]or the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader." 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.34[1][b] (3d ed.1998). Similarly, conclusory allegations of the legal status of a defendant's acts or conclusions of law, need not be accepted as true. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088, 1092 (2d Cir.1995); *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). Lastly, "a Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982).

The Defendants make four arguments in support of their contention that the Plaintiffs' motion for leave to amend should be denied as futile. They are: (1) expiration of the statute of limitations; (2) estoppel;

(3) standing; and (4) failure to plead fraud with particularity pursuant to FRCP 9(b). I address each argument in turn.

### (1) Statute of limitations

▆▆▆▆ Defendants' primary argument in opposition to the Plaintiffs' motion is that the New Claims and the claims sought to be asserted against the Proposed Additional Defendants are time barred. In order to resolve the parties' multilayered arguments with respect to this issue, I must first determine which statute provides the limitations period. I find that § 546 of the Code provides the only applicable limitations period. That section, which is entitled "Limitations on Avoiding Powers" provides, in relevant part, as follows:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after … —

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546 (1998).

Paragraph number two of the Proposed Amended Complaint states that "[t]his adversary proceeding [is] brought … pursuant to … §§ 544(b) and § 550[sic] of the [Code] and N.Y. McKinney's Debtor and Creditor Law §§ 270–278 …." Section 544(b) allows a trustee to stand in the shoes of a creditor and avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable state or federal law.[10] Section 550 defines when and

---

**10.** (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation

incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section

from whom such transfers may be recovered.[11] Here, the applicable law on which Plaintiffs rely to avoid the complained of transactions is the New York fraudulent conveyance law, embodied in §§ 270 to 278 of the Debtor and Creditor Law. Thus, it is apparent from the face of the Proposed Amended Complaint that the Plaintiffs are bringing this action pursuant to § 544 and the state law causes of action that may be asserted thereunder and that, by its explicit terms, § 546 provides the controlling time period.

Plaintiffs argue that § 108, which allows a trustee to take advantage of a state law statute of limitations in certain situations, not § 546, provides the relevant statute of limitations. They argue that, because the substantive law that the Plaintiffs are asserting is embodied in state law, state law should also provide the controlling time period. In this case, they assert that the statute of limitations under state law is the longer of six years or two years from the date of actual or imputed discovery. *See* N.Y.C.P.L.R. §§ 203(g) & 213(8) (McKinney 1998). In addition, they argue that they did not discover the basis of the New Claims or the claims against the Proposed Additional Defendants until April or May of 1998 and that therefore their causes of action are timely under the two-year discovery portion of the state law limitations period.

■ This argument has some appeal since the substantive law upon which the Plaintiffs' claims are based is provided by state law. It must, however, be rejected.

Assuming, *arguendo*, that the Plaintiffs have provided the correct limitations period and that the purported discovery date is correct, the New Claims and the claims against the Proposed Additional Defendants would not be saved by § 108(a). The problem is that the Plaintiffs in this action are standing in the shoes of one or more creditors, *not* the Debtors, and are asserting rights that these creditors may have pursuant state law. Section 108, however, only applies when a trustee is standing in the shoes of the debtor not one or more creditors. Section 108, which is entitled "Extension of time," provides in relevant part:

(a) If applicable nonbankruptcy law ... fixes a period *within which the debtor may commence an action*, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

11 U.S.C. § 108(a) (1998) (emphasis added).

■ The statute is explicit in that it applies to save and preserve a statute of limitations only where the cause of action sought to be asserted by the trustee is a claim that the debtor could have brought. *See Rosania v. Haligas (In re Dry Wall*

---

502 of this title or that is not allowable only under section 502(e) of this title.

(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. § 544(b) (1998).

11. (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

....

11 U.S.C. § 550 (1998).

*Supply, Inc.),* 111 B.R. 933, 935 n. 2 (D.Col.1990); *A.M. Mancuso v. Continental Bank Nat'l Ass'n Chicago (In re Topcor, Inc.),* 132 B.R. 119, 126 (Bankr. N.D.Tex.1991); *Hunter v. Hansen (In re Hansen),* 114 B.R. 927, 932 (Bankr. N.D.Ohio 1990); *Mahoney, Trocki & Assocs., Inc. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.),* 111 B.R. 914, 920 (Bankr.S.D.Cal.1990); Mayerson, et. al, *Four Centuries of Fraudulent Conveyance Law in Forty Minutes: Its Continuing Development and Application,* at 39–40 (PLI Comm.L. and Practice Course Handbook Series No. A4–4413, 1993) (and cases cited therein); *but see Lippe v. Bairnco Corp.,* 225 B.R. 846, 853 (S.D.N.Y.1998) (stating that creditors may take advantage of § 108 but otherwise not discussing or analyzing this issue); *Evans v. Robbins (In re Robbins),* 91 B.R. 879, 883 (Bankr. W.D.Mo.1988) (citing *Old Orchard Bank & Trust Co. v. Josefik (In re Josefik),* 72 B.R. 393, 397 n. 4 (Bankr.N.D.Ill.1987)). I find compelling those cases which read the statute narrowly. I also find that § 546 provides the relevant statute of limitations and it is not extended by reference to § 108(a).

■■■ Applying § 546 to the facts here, the motion for leave to file the Proposed Amended Complaint is not timely. Section 546 provides that an action under § 544 must be commenced within the later of two years after the order for relief or one year after the appointment of a trustee under §§ 702, 1104, 1163, 1202 or 1302, if that appointment is made within the two-year period following the order for relief. Plaintiffs were appointed trustees during the two-year period following the order for relief but they were appointed pursuant to § 1123, which is not one of the enumerated sections entitled to a one year extension of the statute of limitations. *See Liquidation Estate of DeLaurentiis Entertainment Group v. Technicolor (In re DeLaurentiis Entertainment Group),* 87 F.3d 1061, 1064 (9th Cir.1996); *Starzynski v. Sequoia Forest Indus.,* 72 F.3d 816, 820–21 (10th Cir.

1995). *Gleischman Sumner Co. v. King, Weiser, Edelman & Bazar,* 69 F.3d 799, 801 (7th Cir.1995). Here, the order for relief was granted on the filing date, November 17, 1995, and the motion was filed in June of 1998. Therefore, the Plaintiff's motion is untimely in light of the controlling two year statute of limitations outlined in § 546(a).

Faced with the apparent untimeliness of their motion, the Plaintiffs make two arguments to preserve their claims. They argue that the New Claims either relate-back to the date of the Initial Complaint pursuant to FRCP 15(c) or that the statute of limitations should be equitably tolled until the date of the Plaintiffs' motion.

■■■ Rule 15(c) provides that an amended pleading will relate back to the date of filing of a prior pleading where claims asserted in the new pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." FRCP 15(c). The purpose of Rule 15(c) is to provide an opportunity for a claim to be tried on its merits, rather than being dismissed on a procedural technicality. *See Siegel v. Converters Transp., Inc.,* 714 F.2d 213, 216 (2d Cir.1983). Amendments that amplify or restate the original pleading or set forth facts with greater specificity should relate back. *See Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.),* 67 B.R. 304, 305–06 (Bankr.S.D.N.Y.1986). "While courts regularly allow relation back of amendments to permit a plaintiff to correct a procedural deficiency or modify the facts alleged in the earlier pleading, courts do not permit the use of Rule 15(c) to add allegations concerning an entirely different transaction or set of facts." *Grace v. Rosenstock,* 169 F.R.D. 473, 480 (E.D.N.Y. 1996).

■■■ One test that many courts have employed in order to determine whether an amendment to pleadings will relate back is to determine whether the initial

complaint put the defendants, both current and proposed, on notice of what must be defended against in the amended pleadings. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 150 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (noting that "[t]he rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.)" This test does not require that the prior complaint put the defendants on notice of new or additional legal theories that the plaintiffs seek to assert against the defendants, but it must inform the defendants of the facts that support those new claims. *See Brandt v. Gerardo (In re Gerardo Leasing, Inc.)*, 173 B.R. 379, 388 (Bankr. N.D.Ill.1994). *See also Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir. 1994) (finding that for relation back to apply there must be sufficient commonality between the facts alleged in the initial and amended complaints to preclude a claim of unfair surprise); *Coan v. O & G Indus., Inc. (In re Austin Driveway Servs., Inc.)*, 179 B.R. 390 (Bankr.D.Conn.1995) (same); *CIT Group/Factoring Mfrs. Hanover, Inc. v. Srour (In re Srour)*, 138 B.R. 413, 418 (Bankr.S.D.N.Y.1992) "([i]n order for an amendment to relate back, it is crucial that the defendant have ample notice from the original complaint of the particular conduct and facts that are alleged.)"

██ When the allegation in the initial complaint alleges a single or series of transactions sounding in fraud, courts have struggled to find the appropriate balance between the certainty that statutes of limitations are intended to provide and recognizing the difficulty that plaintiffs often have in defining the extent and boundaries of fraudulent acts perpetrated against them. Courts in this district have concluded, and I agree, that the relation back standard should be read broadly in these circumstances. *See In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1264 (S.D.N.Y.1992) (holding that the proposed complaint related back to the initial complaint where the plaintiffs in the initial complaint alleged that the plaintiffs were defrauded by, *inter alia*, the defendants improperly claiming the value of certain sales and the plaintiffs sought to allege in the proposed complaint that the defendants misrepresented the value of related accounts receivable); *Tabacalera Cubana, S.A. v. Faber, Coe & Gregg, Inc.*, 379 F.Supp. 772 (S.D.N.Y. 1974) (finding that relation back applied where the plaintiffs sought to add claims relating to additional shipments that arose out of the same series of transactions, the same parties were involved in the transaction and the defendants had actual notice during the limitations period that the additional claims were likely to be brought); *see also In re Gerardo Leasing, Inc.*, 173 B.R. at 389–90 (concluding that relation back applies where the initial complaint alleged that a stream of $1500 weekly payments from one debtor to the defendant was a fraudulent conveyance and the proposed amended pleadings alleged an additional series of $1500 payments to the defendant which began as soon the first set of payments ended); *but see Metzeler v. Bouchard Transp. Co. (In re Metzeler)*, 66 B.R. 977 (Bankr.S.D.N.Y.1986) (noting that the same transactional overlap required for relation back in preference cases is required in fraudulent conveyance actions).

██ Here, all of the New Claims, except one, do not meet the requirements of Rule 15(c)(2) and therefore do not relate back to the time of the filing of the Initial Complaint. The one claim that seems to arise out of the same "conduct, transaction, or occurrence" as is alleged in the Initial Complaint are the payments to the Charterhouse Group which are described in the Proposed Amended Complaint as "Post–Acquisition Expense Payments" (Counts VII and IX). These payments are similar in timing and nature to the "Pre–Acquisition Expense Payments" and the "Acquisition Fee Payments" alleged in the Initial Complaint. These payments are made

from and to the same parties. The Defendants, therefore, should have been on notice that this group of related payments was going to be challenged by the Plaintiffs. As a result of the similarities between the alleged payments described in the Initial Complaint and the ones described as "Post–Acquisition Expense Payments" and because of the more relaxed Rule 15(c) standard involved here, I find that the allegations underlying these new claims arise out of the same set of operative facts as the claims raised in the Initial Complaint.[12]

■■■ As to all the other New Claims, I find that even under the most liberal reading of the Initial Complaint, a reasonable defendant would not be put on notice of the New Claims or the facts underlying them. The Initial Complaint describes five separate transfers of money from the Debtors to one or more of the Defendants. These transfers are each described as discrete transactions. There is no allegation in the Initial Complaint that the Defendants engaged in some sort of scheme to defraud the Debtors.

I recognize that even without an explicit allegation that the Defendants engaged in a scheme to defraud, a scheme may be implied where such a conclusion would be reasonable based upon the specific matters alleged. Such an implication is appropriate where the initial complaint alleges a series of transactions between the parties. Here, though, the transactions alleged in the Initial Complaint were not a series but, instead, separate payments made to the Defendants during a three-year period. Even if I were to view the allegations in the Initial Complaint as alleging a larger scheme by the Defendants to siphon funds from the Debtors, such a scheme is not logically related to the allegations alleged in the Proposed Amended Complaint such as to put the Defendants on notice of the facts and claims underlying the New

Claims. The Plaintiffs, in the Proposed Amended Complaint, do not seek to challenge putative payments to the Defendants as they do in the Initial Complaint, instead they assert that the transfer of the Debtors' equity as part of a leveraged buyout transaction in addition to the payment of interest and legal fees related to the buyout reduced the Debtors' equity without consideration.

These transactions are distinct as to their nature. Most significantly, the recipients of the challenged payments are different. In the Initial Complaint the Defendants are the alleged recipients while in the New Claims it is CIT, Labatt and the Proposed Additional Defendant Siller Wilk. The facts underlying these allegations are also quite distinct, direct payments from one company to others in the first instance compared with two leveraged buyout transactions and the payment of attorneys fees related to them in the second instance.

Moreover, the cases relied upon by the Plaintiffs are distinguishable. Plaintiffs primarily rely upon *In re Chaus Sec. Litig.; In re Austin Driveway; Tabacalera Cubana;* and *In re Gerardo Leasing, Inc.*

In *Chaus Securities,* discussed above, the court allowed the plaintiff's complaint to relate back where it found that allegations related to misrepresentations in the defendants' accounts receivable were "a 'natural offshoot' of the 'basic scheme' to defraud investors by misrepresenting the company's earnings and profitability." *In re Chaus Sec. Litig.,* 801 F.Supp. at 1264. Here, in contrast, the allegations related to the leveraged buyout are not a "natural offshoot" of the allegations regarding payments from the Debtors to the Defendants.

In *In re Austin Driveway Servs.* the court was faced with the issue of deciding the extent to which the relation back doc-

---

12. I do not reach the question here of whether these claims satisfy the requirements of Rule 15(c)(3) for the addition of new parties.

The Proposed Additional Parties are not yet parties to this litigation and have not appeared to oppose this motion.

trine applied to a series of alleged preference actions. The court specifically limited its holding to the preference context, as compared to the fraudulent conveyance context we have here. *In re Austin Driveway Servs.*, 179 B.R. at 394. In addition to this difference, the court held that relation back would not apply where the plaintiff sought to challenge a payment to the defendant during the preference period that was not raised in the initial complaint. *Id.* at 399. The plaintiff, the court found, did not even hint in the initial complaint that this payment would be challenged nor did the initial complaint raise the specter with the defendant that all payments to him during the preference period were fair game. *Id.* Here, I am faced with a situation that is analogous to that raised in *Austin Driveway*. As in *Austin Driveway*, the Initial Complaint did not even offer a hint that the purchase of the Debtors or the payment of interest and legal fees related to that purchase would be challenged. Thus, to the extent that *Austin Driveway* is applicable to this proceeding it does not support the Plaintiffs' contention that the relation back applies here.

The other cases relied upon by the Plaintiffs *Tabacalera Cubana* and *In re Gerardo Leasing, Inc.* are each discussed above and each presents situations that are distinguishable from this case. Both of these cases involved a complaint which alleged a series of similar, related payments and a proposed amended complaint in which the plaintiffs sought to challenge additional payments that were extensions of these series of transactions.[13] Here, in contrast to those cases, the New Claims are not additional payments that are merely an extension of a series of payments identified in the Initial Complaint.

Finally, the Plaintiffs argue that "[t]here is a clear nexus between the claims of Alter Ego pleaded in [the Initial Complaint] and each of the fraudulent conveyances pleaded in the [Proposed Amended Complaint.]"[14] This argument can be quickly dismissed. Despite the fact that there is some similarity between the elements of the Plaintiffs' claims sounding in alter ego and those sounding in fraud, it is almost axiomatic that a generalized claim of alter ego cannot be the basis for a later, and untimely, claim alleging a specific act of fraud. A conclusion to the contrary would directly and severely undermine the purpose of Rule 15(c)(2), which is to insulate defendants from claims being raised after the running of the statute of limitations except where the facts underlying the additional claims are raised in the initial pleading and where the claims sought to be added are logically related to those already raised. Because the New Claims are premised upon different factual underpinnings and are not logically related to the claims raised in the Initial Complaint (except the claim addressing "Post–Acquisition Expense Payments"), they do not relate back to the date of filing of the Initial Complaint.

Alternatively, the Plaintiffs argue that if I should find that the New Claims do not relate back to the filing of the Initial Complaint, then I should equitably toll the statute of limitations until the Plaintiff's filing of this motion. The doctrine of equitable tolling allows a claim to be filed outside of the applicable limitations period where some action on the defendant's part makes it such that the plaintiff is unaware that the cause of action exists. *See Meridien Int'l Bank Ltd. v. Government of the Republic of Liberia*, 23 F.Supp.2d 439, 446 (S.D.N.Y.1998) (*citing Long v. Frank*, 22 F.3d 54, 58 (2d Cir.

---

**13.** To the extent that *Tabacalera Cubana* stands for a broader extension of Rule 15(c)(2), it has been rejected by several courts in this District. *See, e.g., In re Kam Kuo Seafood Corp.*, 67 B.R. at 308; *In re Metzeler*, 66 B.R. at 983.

**14.** Plaintiffs' Memorandum of Law dated August 20, 1998 at 16.

1994), *cert. denied,* 513 U.S. 1128, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995)). Based upon the allegations contained in the Proposed Amended Complaint, I find that the Plaintiffs have pleaded sufficient facts, should they prove them, to support equitable tolling of the statute of limitations.

■ The question of whether a statute of limitations should be equitably tolled is necessarily a factual one and is often not ripe for consideration on a motion to dismiss. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1391 and n. 10 (3d Cir.1994) (noting that in order for a plaintiff to defeat a motion to dismiss all that is required of the plaintiff is that she plead the applicability of the doctrine of equitable tolling); *In re Gilmore,* 198 B.R. 686, 690 (Bankr.E.D.Tex.1996); *Moratzka v. Pomaville (In re Pomaville),* 190 B.R. 632, 638 (Bankr.D.Minn.1995).

■ Here, the Plaintiffs allege in the Proposed Amended Complaint that the Debtors were dominated and controlled by the Defendants. In addition, the Plaintiffs allege in the Proposed Amended Complaint that the Debtors' assets were wrongfully shifted from the Debtors to the Defendants.[15] These allegations are sufficient, at this point in the litigation, to defeat a motion to dismiss based upon timeliness. It simply cannot be said that the Plaintiffs will be unable to prove equitable tolling.

■ In particular, Plaintiffs' allegations give rise to the potential assertion of two varieties of equitable tolling. One is fraudulent concealment which occurs

> when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud has been concealed, or is of such character as to conceal itself, the

statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing, or those in privity with him.

*Bailey v. Glover,* 21 Wall. 342, 88 U.S. 342, 349–50, 22 L.Ed. 636 (1874); *Metzeler v. Bouchard Trans. Co. (In re Metzeler),* 66 B.R. 977, 981 (Bankr.S.D.N.Y.1986).

■ The second is adverse domination. "Adverse domination permits the statute of limitations on a claim to be tolled 'where an action is brought on behalf of an entity which has been defrauded by persons who completely dominated and controlled it.' " *Meridien Int'l,* 23 F.Supp.2d at 447 (*quoting Armstrong v. McAlpin,* 699 F.2d 79, 87 (2d Cir.1983)).

These issues can only be analyzed after a thorough factual inquiry and are, therefore, not properly addressed on a motion to dismiss. *See Hill v. Equitable Bank, N.A.,* 599 F.Supp. 1062, 1077 (D.Del.1984); *Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.),* 199 B.R. 502, 515 (Bankr.D.N.J.1995) (holding that "[t]he tolling principles of fraudulent concealment and adverse domination involve questions of fact which cannot be resolved as a matter of law on a motion to dismiss."); *Kaliner v. Load Rite Trailers, Inc. (In re Sverica Acquisition Corp.),* 179 B.R. 457, 470 (Bankr.E.D.Pa.1995) ("[s]ince the Trustee has pled facts to raise a claim of control of the debtor by the [defendants] the Court cannot dismiss the possibility that the equitable tolling doctrine of adverse domination might be applicable in this case. Given that possibility, it is inappropriate to grant the motion to dismiss [on the grounds that the complaint is] barred by the statute of limitations."). These allegations raise the possibility that the Plaintiffs will be able to prove that equitable tolling should apply to

---

**15.** These allegations, which are discussed more fully in the section addressing Rule 9(b), are pleaded with considerable specificity and clarity. This is significant because I do not believe that a plaintiff, even if that plaintiff is a trustee in bankruptcy, can defeat a motion to dismiss based upon timeliness simply by asserting, without more, that the statute of limitations should be tolled for equitable reasons. In this case, though, the Plaintiffs have made specific factual allegations.

their newly alleged claims. The Defendants' motion to dismiss on the ground of timeliness is denied, without prejudice to their right to assert it as an affirmative defense.

### (2) Estoppel

The Defendants also argue that based upon an Order I signed during the early stages of the Debtors' bankruptcy cases, the Plaintiffs are precluded from asserting claims against them for reaping the benefits of the pledge of collateral to CIT. In particular, the Defendants cite to a stipulation and order dated December 13, 1995 and signed by the Debtors and CIT entitled Amended Emergency Stipulation and Order Regarding (I) Immediate Use of Cash Collateral and (II) Interim Discretionary Post–Petition Financing (the "Cash Collateral Order"), which states:

> The failure of any creditor or party-in-interest to contest the validity of [CIT's] claims against the Debtors, the validity of [CIT's] liens on the Collateral or the priority of payment on account of such claims on or prior to January 5, 1996 shall preclude such creditor or party-in-interest from contesting such matters at any subsequent time in this or any other proceeding.

No creditor or other party-in-interest contested the validity of CIT's claims against the Debtors or the validity of CIT's liens on the collateral on or prior to January 5, 1996. The Defendants cite to no case authority to support their contention that the Order had the effect of cutting off claims to any party to the transaction. Instead, they merely conclude that the Plaintiffs' claims regarding the pledge of collateral to CIT and the attendant transfer of the Debtors' equity to the Defendants are estopped by the above cited paragraph of the Cash Collateral Order.

■ I find this argument unpersuasive. The Order was intended to protect CIT from future attacks as to its rights as a secured lender. It was never intended to insulate every conceivable party to the leveraged buyout transaction from liability and that question was never before the Court. This conclusion is supported by the fact that only the Debtors and CIT signed the stipulation. If the rights of others were being affected by the stipulation, they would have, by necessity, been parties to the stipulation. As a result, I cannot say that, as a matter of law, the Plaintiffs can prove no set of facts in support of their claim that would entitle them to relief.[16] Furthermore, even if my Order could arguably be interpreted the way the Defendants contend, such an interpretation would lead to an absurd and unfair result.

### (3) Standing

Defendants' third futility argument is that the Plaintiffs' lack standing to bring a fraudulent conveyance action against the Defendants. The Defendants argue that the Plaintiffs lack standing because they have failed to demonstrate, and cannot demonstrate, that there is an unsecured creditor of the Debtors who was holding an allowed unsecured claim at the time of the allegedly fraudulent transfers. *See Young v. Paramount Communications, Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr.S.D.N.Y.1995). In support of this contention, the Defendants argue that the Debtors were shell corporations and lacked creditors of any kind pri-

**16.** This conclusion is true at least at this stage of the case. My determination here with respect to this claim is based upon the rigorous standard that a party must meet in order to be successful on a Rule 12(b)(6) motion and does not preclude the possibility that the Defendants can make a factual showing at some point in the case that would cause me to reach a contrary conclusion. *See, e.g.,* *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441, (1980) ("It is axiomatic that a complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))).

or to the acquisitions of Everfresh and Sundance on January 31, 1992. As a result of the fact that the Defendants were shell corporations with no creditors prior to the purchases, the Defendants conclude that the Plaintiffs, whose standing is based upon the rights of one or more creditors to avoid a conveyance, lack standing to contest any transfer that occurred on or before the purchase date. The transactions that would be dismissed based upon this futility argument, if I were to agree with the Defendants, are: the pledge of collateral to CIT (Counts I and III) and the legal fee acquisition payment to Siller Wilk (Counts VIII and X). Each of these transactions took place on January 31, 1992.

▆ I do not agree with this prong of the Defendants' motion. The primary shortcoming of the Defendants' argument is that it fails to take into account that the Plaintiffs' standing in this case is necessarily a factual question and, therefore, is not appropriately addressed in a Rule 12(b)(6) motion to dismiss. In addition, the Plaintiffs' argument raises important public policy concerns that I am not ready to dispense with at this early juncture of the case.

The Defendants rely on *Kaliner v. Load Rite Trailers, Inc. (In re Sverica Acquisition Corp.)*, 179 B.R. 457 (Bankr.E.D.Pa. 1995) and *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97 (Bankr.D.Mass.1992) in support of their argument. This reliance is misplaced. Those cases are distinguishable from this case and, to the extent that they are not, I choose not to follow them.

In *In re Sverica Aquisition Corp.* the plaintiff-trustee sought to undo and attack a leveraged buyout as a fraudulent trans-

fer. The defendants, who were the sellers of three corporations purchased by the debtor, moved to dismiss the trustee's complaint on the ground that he lacked standing. *See In re Sverica Aquisition Corp.*, 179 B.R. at 464. In particular, the defendants argued that the debtor did not exist prior to the leveraged buyout transaction and only came into being for the purpose of acquiring the subject corporations. *See id.* at 465. As a result, the defendants argued that the debtor "had no creditors of its own at the time the transactions took place who could have asserted a claim under the UFCA." *Id.*

The *Sverica* court did dismiss the plaintiff's complaint, but not because the purchaser was a shell corporation. *Id.* Instead, the court held that the plaintiff's complaint was so lacking in specificity that it did not meet the general pleading standard outlined in Rule 8 of the FRCP. *Id.* The court's discussion, therefore, of whether the trustee had standing was *dicta*. In addition, the court's discussion of the plaintiff's argument regarding the shell corporation is incomplete and of little assistance.[17]

The other case relied upon by the Defendants, *In re Morse Tool, Inc.*, is similarly not helpful. In *Morse Tool*, as here, a trustee sought to attack a leveraged buyout and attendant transfer of a security interest as a fraudulent conveyance. *See Morse Tool, Inc.* at 104. The court in *Morse Tool* held that the trustee-plaintiff lacked standing to assert a claim against the lender in a leveraged buyout transaction where a shell corporation, which later became the debtor, purchased the assets and assumed the liabilities of a corporation. *See id.* at 131. The court reasoned

---

17. The *Sverica* court tacitly acknowledged, however, that the resolution of the defendants' argument necessarily turned on facts not alleged in the complaint and was not properly disposed of in a motion to dismiss. In discussing this portion of the defendants' motion the court stated, "If [the defendants' contentions are] true, then it would appear that Trustee lacks standing to assert claims under [the constructive fraud section of the UFCA] since [that provision] of the UFCA [is] only applicable to redress injuries to creditors that were in existence at the time of the transfers." *Id.* I note that, here the Defendants are alleged to be alter egos of the Debtors and to have used the Debtors as tools for their own enrichment at the expense of the Debtors' creditors.

that the shell corporation, which ultimately became the successor entity, had no creditors at the time of the buyout transaction and, therefore, the requirement of the statute of a current claim at the time of the complained of transaction was not met. *See id.*

Significantly, though, *Morse Tool* was not decided as a motion to dismiss but after trial. *See id.* at 105. Before deciding the question of whether the trustee had standing the court heard ten days of trial testimony, the deposition testimony of eighteen witnesses and examined 116 exhibits. *See id.* Drawing upon this evidence, the court made numerous findings of fact. *See id.* at 108–30. Thus, that court was in a position, which I am not, to determine the nature of the claims asserted against the lender, the structure and financing of the leveraged buyout transactions and the organization and financing of the parties to it. In contrast, I can only look to the complaint to determine this motion and it does not contain any of this information. *See Nerney v. Valente & Sons Repair Shop,* 66 F.3d 25, 29 (2d Cir.1995) (reversing District Court, which had denied plaintiff's motion for leave to amend the complaint on futility grounds, because the proposed amended pleadings raised questions of fact).

Furthermore, the court in *Morse Tool* based its conclusion, in part, on the fact that the seller of the entity the debtor purchased remained liable for the claims against that entity. *See id.* at 131. As a result, the court concluded that "[t]he buyout did not weaken the obligor on [the claims against the entity which was purchased]; rather, it gave the claimants a second obligor to look to for satisfaction of their claims." *Id.* at 131. In this case, in contrast, there appears to be no solvent obligor to which the Plaintiffs may look to for satisfaction of their claims.

Lastly, the defendant in *Morse Tool* had a different relationship with the debtor than the Defendants do here. The defendant in *Morse Tool* was the lender, a third party to the transaction, and not an alleged alter ego.

Defendants also misconstrue the extent of the holding of these cases. In each case, the deciding court specifically limited its holding to causes of action premised upon UFCA § 4 and not to §§ 5 & 7. *See In re Sverica Acquisition Corp.* 179 B.R. at 465; *In re Morse Tool, Inc.,* 148 B.R. at 130. In this proceeding, the cases only apply to the Plaintiffs' proposed causes of action premised on § 273 of the New York Debtor and Creditor Law (constructive fraud). The cases do not apply to the other causes of action (actual fraud) because the language of the relevant statute allows for future creditors who are injured by the fraudulent conveyance to bring suit. *See Shelly v. Doe,* 249 A.D.2d 756, 1998 N.Y. Slip Op. 03645, 671 N.Y.S.2d 803, 806 (3d Dep't 1998) (holding that Debtor and Creditor Law §§ 275 and 276 give rise to a cause of action for both present and future creditors); *Julien J. Studley, Inc. v. Lefrak,* 66 A.D.2d 208, 213, 412 N.Y.S.2d 901 (2d Dep't 1979) ("a creditor has standing to maintain an action to set aside a fraudulent transfer, though his debt may not have been in existence at the time of the transfer. . . ."); *In re Rosenfield's Will,* 213 N.Y.S.2d 1009 (Surrogate's Ct., Westchester County 1961). Therefore, since the Plaintiffs' standing under § 544(b) of the Code is derived from actual creditors who would have standing to sue, the Plaintiffs' standing is in question only as to those causes of action premised upon constructive fraud since that requires creditors who are in existence at the time of the challenged transfer.

Finally, to the extent that the cases cited by the Defendants are not distinguishable from the case before me, I choose not to follow them. This motion addresses important issues of public policy. I do not believe that Congress intended to allow corporate acquisition transactions to be so structured as to insulate the structures from liability in the event that the acquired company files for bankruptcy

and that another party to the transaction looted the debtor.

The Defendants' argument is troubling. According to their reading of *Morse Tool* and *Sverica*, an entity that is acquired by merger into a shell corporation is precluded from bringing a fraudulent conveyance action against *anybody* for acts that took place prior to the acquisition. Such an outcome may well be violative of both our system of civil justice, which seeks to impose liability on those causing harm, and fundamental principles of bankruptcy law, which has as an underpinning the concept that parties should not be allowed to usurp to themselves assets which are rightfully owed to the estate and the debtor's creditors. Therefore, in addition to the legal flaws in the Defendants' arguments regarding the Plaintiffs' standing, I am not prepared, before issue is joined and the facts are clear, to deny the Plaintiffs their day in court based upon this standing issue. *See In re Rosenfield's Will*, 213 N.Y.S.2d at 1015 ("[e]ven apart from statute courts will refuse to enforce an undertaking contrary to the public interest." (*citing Flegenheimer v. Brogan*, 284 N.Y. 268, 30 N.E.2d 591 (1940))).

#### (4) Rule 9(b)

The fourth and final futility argument raised by the Defendants, is that the Proposed Amended Complaint fails to satisfy the particularized pleading requirement of Rule 7009(b) of the Federal Rules of Bankruptcy Procedure.[18] Pursuant to this rule, certain aspects of claims sounding in fraud or mistake must be pleaded with particularity. It provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Bankr.P. 7009(b).

■ The requirements of Rule 9(b) apply to fraudulent conveyance claims un-

der the New York Debtor and Creditor Law. *See Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 251 (2d Cir.1987); *O'Connell v. Gold (In re Gold)*, 192 B.R. 605, 610 (Bankr.E.D.N.Y.1996); *Barclays Bank of New York v. Goldman*, 517 F.Supp. 403, 416 (S.D.N.Y.1981). The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).

■ The Second Circuit has instructed that in order for a pleading to meet the requirements of Rule 9(b), the allegations must specify the statements that the plaintiff contends are fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *See Shields*, 25 F.3d at 1127–28 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993) (other citations omitted)). *See also Ouaknine v.. MacFarlane*, 897 F.2d 75 (2d Cir.1990) ("[t]o pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation"). The allegations must go beyond mere conclusory allegations. *See Allen–Bradley Co. v. Commodore Bus. Machs., Inc. (In re Commodore Bus. Machs., Inc.)*, 180 B.R. 72 (Bankr.S.D.N.Y.1995).

■ In the bankruptcy context, however, courts have noted that Rule 9(b) should be interpreted liberally, particularly when the trustee, a third party outsider to the fraudulent transactions, is bringing the action. *See Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.)*, 199 B.R. 502, 514–15 (Bankr.D.N.J.1995). *See also Eisenberg v. Feiner (In re Ahead by a*

---

**18.** Rule 7009 of the Federal Rules of Bankruptcy Procedure makes Rule 9 of the FRCP applicable to adversary proceedings before Bankruptcy Courts.

*Length, Inc.),* 100 B.R. 157, 166 (Bankr. S.D.N.Y.1989); *Davidson v. Bank of New England, N.A. (In re Hollis and Co.),* 86 B.R. 152, 156 (Bankr.E.D.Ark.1988); *Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.),* 32 B.R. 199, 203 (Bankr. S.D.N.Y.1983).

■ After reviewing the Proposed Amended Complaint, I find that the Plaintiffs have met the particularized pleading requirements of Rule 9(b). As to each of the complained of transactions, in the Proposed Amended Complaint the Plaintiffs identify the date of the transaction, the recipient of the proceeds, and the name given the transaction in the Debtors' books and records. In addition, the Plaintiffs identify numerous specific creditors whom, they contend, had claims against the debtors which existed prior to the complained of transactions and which remained unpaid as of the date of the transfer as well as thereafter. Thus, the Proposed Amended Complaint meets the requirements of Rule 9(b), particularly since the Plaintiffs are trustees.

■ The Defendants also argue that the Proposed Amended Complaint is deficient because it fails to allege with sufficient particularity the fraudulent activities of each Defendant. I disagree. When multiple defendants have been accused of fraud, the general rule is that the pleadings must allege the fraudulent conduct of each defendant. *See Clifford v. Hughson,* 992 F.Supp. 661, 666 (S.D.N.Y.1998). The purpose of this rule is to "inform each defendant of the nature of his alleged participation in the fraud." *Id.* (*citing DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987)).

The Proposed Amended Complaint sufficiently puts each Defendant on notice as to the claims against it. As discussed above, except for a couple of exceptions which I will discuss below, the Proposed Amended Complaint identifies the recipient or recipients of the challenged payments. The same can be said of the allegations regarding the transfer of the Debtors' assets and equity to CIT, Labatt and Stroh. The Plaintiffs identify, in large part, each Defendant's role in the acquisition and payment transactions. *See, e.g.,* Proposed Amended Complaint ¶ 45(a–q). The Defendants, however, identify two counts in the Proposed Amended Complaint which they argue are particularly lacking in specificity as to what each Defendant did. These are Counts XI and XII. These two counts are essentially catchall counts, one alleging that all of the complained of transfers are constructive fraud and the other alleging that all of the complained of transfers are actual fraud, apparently intended by the Plaintiffs to allow them to allege during trial that the transactions were part of a scheme.

■ The Defendants' argument is misplaced. This complaint was served before full discovery was completed. The very nature of these two counts is to assert group-wide or defendant-wide responsibility for the complained of transactions. These counts clearly are not alleged for the purpose of expanding the range of transactions that the Plaintiffs will seek to prove at trial. Moreover, the purpose of the allegations embodied in Counts XI and XII necessitates a lack of specificity as to the participation of each Defendant.

■ Even if the Proposed Amended Complaint was not particular as to each Defendant's role in the alleged fraudulent conveyances, there is an exception to the general rule where the defendants are affiliates and insiders of an entity accused of committing fraud. In that instance, each individual's conduct need not be specifically detailed since it is assumed that the parties are aware of the fraudulent activities of the others and responsible for them. *See Luce v. Edelstein,* 802 F.2d 49 (2d Cir.1986); *ESI Montgomery County, Inc. v. Montenay Int'l Corp.,* 1996 WL 22979, *3 (S.D.N.Y.1996). *See also Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1207 (S.D.N.Y.1992) (noting that "no specific connection between fraud-

ulent representations or omissions need be pleaded as to defendants who are insiders or affiliates personally participating in the statements at issue").

It is this exception, first articulated in *Luce,* that controls here. The Defendants are alleged to be insiders of each other and of the Debtors. Furthermore, the Plaintiffs' allegations go well beyond mere conclusory statements regarding the interlocking management and ownership of the Defendants and their insider status *vis-a-vis* the Debtors. For example, the Plaintiffs state in the Proposed Amended Complaint that:

(a) [Charterhouse Group] orchestrated each and every detail of the manner of the acquisition of the Debtors and the structure of their ownership;

(b) [Charterhouse Group] first created Tellin to be the purchaser of the Debtors, with CEP to initially hold 75 percent of the interests in Tellin, with the remaining 25 percent interest to be held by non-voting Management Investors, including, inter alia, Pomroy, Conway, and Siller;

(c) After the closing on the Acquisition Transactions, [Charterhouse Group] caused the stock of Tellin to be conveyed to Tellin Holdings ... in which CEP continued to be the beneficial owner of 75 percent of the interests in Tellin Holdings;

(e) In [a Notice of Call of Capital dated January 17, 1992, two weeks before the closing on the Acquisition Transactions], [Charterhouse Group] President and co-CEO, Jerome Katz, in his capacity as President of CEP, ... [stated] that "[Charterhouse Group] controls the General Partner [CEP] and the Managing Agent ...";

(f) In a letter written on or about February 20, 1992, by Coopers & Lybrand, outside auditors to the Debtors and to [Charterhouse Group] and its Related Companies, it is stated that, CEP, with a 57% to 87.5% equity

interest [in Tellin], has control. Management shares are non-voting, and represent a minority.... More Specifically, CEP will have control over business and financial facets such as: business strategy; possible expansions; the level of marketing expenditures; plant expenditures; key personnel decisions, and, ultimately and most importantly, the disposition of business.

Proposed Amended Complaint at ¶ 45(a–c, e, f)

Based upon these allegations, as well as others in the Proposed Amended Complaint, I find that the Plaintiffs have sufficiently pleaded the Defendants' insider status with respect to each other and the Debtors. *See* § 101(31) of the Code (providing that directors and officers of the debtor and affiliates of the debtor are insiders); 101(2) (" 'affiliate' means—[an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor....);" *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (noting that directors and officers are insiders for Rule 10(b)–5 purposes). Since, for the purpose of this motion I am accepting the Plaintiffs' allegations regarding the Defendants' insider status as true, the Plaintiffs need not allege the specific fraudulent conduct of each Defendant.

In conclusion, the "determination of the adequacy of a complaint under Rule 9(b) is ultimately and necessarily fact-specific; accordingly: '[Rule] 9(b) particularity is much like obscenity, legally speaking: I know it when I see it.' " *Jeff Isaac Rare Coins, Inc. v. Yaffe,* 792 F.Supp. 13 (E.D.N.Y.1992) (*quoting United States v. Rivieccio,* 661 F.Supp. 281, 290 (E.D.N.Y. 1987) which, of course, was paraphrasing Justice Potter Stewart from his famous concurring opinion in *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12

L.Ed.2d 793 (1964)). Under the facts presented here, I hold that the Proposed Amended Complaint satisfies the pleading requirements of Rule 9(b).

### b. Prejudice and Delay

In addition to opposing the Plaintiffs' motion on the grounds of futility, the Defendants make two other arguments in opposition to the Plaintiffs' motion for leave to amend. They argue that the Plaintiffs' motion should be denied for the separate and independent grounds of prejudice and delay. In particular, they argue that they will be significantly prejudiced if the Plaintiffs' motion is granted because the Proposed Amended Complaint contains allegations regarding different transactions than those alleged in the Initial Complaint. They also argue that the addition of the Proposed Additional Defendants will necessitate substantial delay in this adversary proceeding because there will be additional discovery and potentially further motion practice. In addition, the Defendants state that the amount sought by the Plaintiffs in the Proposed Amended Complaint is significantly more than that which is currently being sought. Finally, the Defendants contend that the Plaintiffs could have made out all of the allegations that are embodied in the Proposed Amended Complaint at the time that they filed the Initial Complaint and that the seven months that passed between the filing of the Initial Complaint and the filing of this motion, exacerbates the prejudice described above and are signs that the Plaintiffs acted in a dilatory manner.

The Defendants' arguments do not rise to the level necessary to overcome Congress' explicit mandate that "leave should be freely given." FRCP 15(a). They have failed to meet the weighty burden that is upon them in opposing a motion for leave to amend. *See Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234 (2d Cir.1995) (pointing out that "[t]he Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.)' " (*quoting Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *Losquadro v. FGH Realty Credit Corp.,* 959 F.Supp. 152, 159 (E.D.N.Y.) "(Only 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party ...' will serve to prevent an amendment prior to trial.)" (*quoting Foman,* 371 U.S. at 182, 83 S.Ct. 227).

▌ Virtually every time a party amends its pleadings, it is, by definition, prejudicial to that party's opponents. In order for a party to be denied the right to amend its pleadings, though, the burden is on the non-moving party to show not just prejudice or delay but significant prejudice or undue delay. Here, the Defendants have not made such a showing. Significantly, the Plaintiffs sought to amend their pleadings at a relatively early stage in the discovery process. While many documents have been exchanged, no party has been deposed. Furthermore, the trial has not been scheduled and will not be significantly delayed by allowing the Plaintiffs to amend their pleadings. In addition, the delay of seven months between the Initial Complaint and this motion, in a case as complicated as this, is not long enough to be considered undue.

In sum, I find that the arguments made by the Defendants in opposition to the Plaintiffs' motion are of a lesser degree and kind than the Second Circuit Court of Appeals teaches is needed in order to defeat such a motion. *See MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998) (concluding that leave to amend was properly denied where the motion was made more than five years after the complaint was filed and more than two years after the close of discovery; that the new claims would require additional discovery; and that the delay was unexplained); *Krumme v. Westpoint Stevens*

*Inc.,* 143 F.3d 71, 87–88 (2d Cir.1998) (holding that leave to amend should not be granted where the motion was made for leave to amend after discovery was complete and where the movant waited several years after learning of the facts underlying the new claims before seeking to amend); *Zahra v. Town of Southold,* 48 F.3d 674, 685–86 (2d Cir.1995) (affirming denial of leave to amend where the request to amend the complaint was filed two and one-half years after the commencement of the action and three months prior to trial); *Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234–35 (2d Cir.1995) (noting that "delay alone … does not usually warrant denial of leave to amend" and affirming trial court's holding that a four year delay in amending an answer is not *per se* undue delay or significant prejudice). The Plaintiffs' excuse for their delay in asserting the claims contained in the Proposed Amended Complaint is reasonable and credible. Moreover, the Defendants have failed to show how this motion would significantly prejudice their ability to defend the claims against them in a timely fashion.

### CONCLUSION

The Plaintiffs' motion for leave to amend their complaint is granted.

Settle Order.